Roberta CARTER, Respondent,

v.

**WILLERT HOME PRODUCTS, INC., Appellant.**

No. 67893.

Supreme Court of Missouri, En Banc.

July 15, 1986.

Rehearing Denied Sept. 16, 1986.

and $35,000 punitive damages on her petition for slander. The Court of Appeals, Eastern District, issued its opinion affirming the judgment, but ordered the cause transferred on the basis of a perceived conflict with *Rauch v. Gas Service Company*, 241 Mo.App. 976, 235 S.W.2d 420 (1950). We have jurisdiction pursuant to Mo. Const. art. V, § 10. We affirm the judgment of the trial court.

In the point on which transfer was ordered, defendant urges that the trial court erred in failing to direct a verdict at the close of plaintiff's case, in that plaintiff failed to demonstrate the existence of "special damage," as required in suits for slander which are not actionable *per se*. Alternatively, defendant contends that the actual damage award should be reduced to a nominal amount, since there was no proof upon which to base an evaluation of that damage for which recovery is permitted in suits of this nature. The premise of this latter argument is that plaintiff was not entitled to recover damages for mental suffering and humiliation, this being a slander not actionable *per se*.

### I.

In reviewing an order denying a motion for directed verdict, the evidence is to be viewed in the light most favorable to the party against whom the motion was made. *In Re Estate of Passman*, 537 S.W.2d 380, 385 (Mo. banc 1976); *Mann v. United Missouri Bank of Kirkwood*, 689 S.W.2d 830, 831 (Mo.App.1985).

Plaintiff was hired by defendant in July, 1977, as a packer and was employed by defendant until the Fall of 1981. In mid-October, 1980, she received a three-day disciplinary layoff, during which period she contacted Civic Finance Company by telephone about obtaining a $500 loan for home repairs. Civic Finance, a company involved in making small consumer loans, had loaned plaintiff money in her own name on three or four previous occasions. Civic Finance had not made a loan to plaintiff since her marriage in December, 1979,

Joseph H. Mueller, Robyn Greifzu Fox, John H. Quinn, III, St. Louis, for appellant.

Larry W. Glenn, St. Louis, for respondent.

ROBERTSON, Judge.

Defendant appeals from the judgment of the trial court, entered on a jury verdict, awarding plaintiff $12,000 actual damages

nor had it previously loaned money to plaintiff's husband.

Donna Ryan, the assistant manager of Civic Finance Company in 1980, testified at trial that her duties included investigating and verifying credit applications. She stated that her daughter, Michelle Ryan, was employed by Civic Finance as a "cashier-clerk" and often handled "basic verification" which included contacting applicants' employers. She also identified an employment verification form pertaining to plaintiff, and stated that the handwriting on it was Michelle's. The form contained a "yes" response in regard to "suits, credit complaints", and a notation which read "spoke to Edna Baines."

Because Donna Ryan believed plaintiff to be "an excellent paying customer and very, very fine lady", she was "totally shocked" by the information on the form. She called defendant and asked to speak to Edna Baines. She was informed that there was no Edna Baines employed by defendant, and was put in contact with Edna Raines. She testified that she was told by Ms. Raines that plaintiff had "credit complaints", as well as "judgments and garnishments" against her, was on disciplinary layoff and "would probably be fired." Donna Ryan then obtained a credit report on plaintiff and called Landmark Bank, where plaintiff had an automobile loan account. Those inquiries indicated that plaintiff had an "excellent payment history" and that the loan account at Landmark was "in excellent condition."

After this verification process she called plaintiff and "told her what they had said at Willert." Donna Ryan testified that plaintiff was "speechless, practically. And she started crying. And she said that [those] things were not true." However, Ms. Ryan informed plaintiff that "under the circumstances ... [she] could not extend her any further money."

Plaintiff testified that after this conversation she went to the Civic Finance office. She further stated:

I felt really embarrassed, ... I felt hurt and I felt humiliated.... because I had worked hard to build my credit to where it was, and for somebody to just say, you know,—to just take it away, to me it seemed like it was just gone down the drain, and to know that my employer would do this behind my back, give out this type of information, that wasn't true.

A loan was eventually made jointly to plaintiff and her husband. Including previous loan balances and insurance charges, the amount financed totaled $1,204.67, of which $580 represented the amount of new cash disbursements. Finance charges brought the total owed to $1,720.44. Donna Ryan testified that plaintiff certainly would have qualified for a $1,200–$1,300 loan in her name alone, had it not been for the information obtained from defendant.

Sandra Rosen, President of Civic Finance, stated at trial that although the company generally required co-signers on loans greater than $1,000, there was no such formalized policy. Prior experience with a customer was an important factor. Ms. Rosen considered plaintiff a "fine credit risk" and stated that "she had established her own credit." Ms. Rosen testified further that based upon her knowledge of and business dealings with plaintiff, plaintiff could have qualified for a $1,200–$1,300 loan in her own name. Plaintiff testified that when she inquired as to why her application was rejected, Ms. Rosen told her that a co-signer was necessary because of the information received from defendant. Plaintiff would not have needed a co-signor if Civic Finance had not obtained the information from Edna Raines about plaintiff's credit problems.

Edna Raines also testified for plaintiff at trial. She stated that in October, 1980, she was defendant's plant secretary. As part of her job duties she handled employment verification requests over the telephone. Ms. Raines denied having said anything to Civic Finance regarding garnishment, judgments, or credit companies against plaintiff, and said she had no such knowledge.

At the close of plaintiff's evidence defendant moved for a directed verdict, which

the trial court denied. Defendant's only witness was Susan Hantak, the Vice-President and Controller of Willert Home Products. She testified that information regarding garnishments could be obtained only from her. Written authorization from the employee was required. She also stated that additional credit information was never released.

## II.

In the early history of slander, as an oral defamation, jurisdiction of the cause fell upon the ecclesiastical courts. Prosser, Libel Per Quod, 46 Va.L.Rev. 839, 841 (1960). As a result, and in contrast to the treatment of libel, the common law courts refused to countenance actions for slander unless some "temporal" damage could be shown, it otherwise being a matter for the spiritual authorities. *Id.* As a result, the common law limited actionable slander to two instances: those in which plaintiff could prove a pecuniary loss, and those in which such a loss could be conclusively presumed. *Id.* This latter class of cases, which came to be known as slander *per se,*[1] included allegations that the plaintiff was guilty of a crime, was stricken with a loathsome disease or was unchaste (in the case of a woman), or which affected the plaintiff in his business or occupation. *Id.; Brown v. Kitterman,* 443 S.W.2d 146, 153 (Mo.1969).

The requisite "special damage," as it has become known, in the remaining class of cases has been said to consist of "such items as a lost contract, sale or other valuable item." *Williams v. Gulf Coast Collection Agency Company,* 493 S.W.2d 367, 370 (Mo.App.1973) (addressing special damage in an action for libel *per quod*). Similarly, it has been stated that

The special damages necessary to support an action for defamation, where the words are not actionable in themselves

must be the loss of money, or of some other material temporal advantage capable of being assessed in monetary value. [Citations omitted.] The loss of a marriage, of employment, of income, of profits, and even of gratuitous entertainment and hospitality will be special damage if the plaintiff can show that it was caused by the defendant's words; but not mere annoyance or loss of peace of mind, nor even physical illness occasioned by the defamatory charge.

*Mell v. Edge,* 68 Ga.App. 314, 22 S.E.2d 738, 739 (1942) [*quoting* Odgers, Libel and Slander, 378 (5th ed.) ]; *see also* Restatement (Second) of Torts § 575, Comment (b) (1977) ("the loss of something having economic or pecuniary value"); *Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998, 1000 (1984) [quoting Comment (b) ]. Sufficient special damage to make a non-*per se* slander actionable has been found where the plaintiff alleged the loss of a particular sale of property to particular parties, notwithstanding the difficulty of placing a value on such a loss. *Privitera v. Town of Phelps,* 79 A.D.2d 1, 435 N.Y. S.2d 402, 406 (1981).

■ In the present case, plaintiff has proven sufficient special damage by showing that she was deprived of the benefit of an impending agreement with Civic Finance to obtain a loan without the additional security of a co-obligor. While no evidence of the value of this contractual term was offered, its loss was a temporal damage, capable of being given a value in money. This conclusion is not altered by the fact that plaintiff ultimately obtained the contemplated loan. The finance company rejected her loan application and made the loan only after additional security was provided.

Nor is the conclusion affected by evidence, as pointed to by defendant, that

---

**1.** The term "slander *per se*" must be distinguished from the term "libel *per se*" and its comparative, "libel *per quod*." *"Per se"* libel refers to a libel, the defamatory nature of which is apparent upon the face of the publication, without resort to extrinsic facts; *"per quod"*

libel refers to the contrary circumstance in which the defamatory nature of the publication is not readily apparent. Prosser, *supra,* at 841, 848; *see also* Prosser, More Libel Per Quod, 79 Harv.L.Rev. 1629, 1630 (1966).

Civic Finance maintained a general policy in favor of co-obligors on loans in excess of $1,000. The same witness who described this policy testified, and the jurors were reasonably entitled to believe, that plaintiff was qualified to obtain the contemplated loan in her own name, based on previous credit experience with the company.

■ Once it is established that a slander is actionable, either as a slander *per se* or upon proof of special damage, the plaintiff is entitled to recover such actual damages as may have resulted from the slander, including damages for emotional distress. Restatement (Second) of Torts § 623 and Comment (a) following (1977). As previously indicated, the only difference between those slanders actionable *per se* and those actionable upon proof of special damage is that in the former case the requisite damage is conclusively presumed. It is well settled that in an action for slander *per se*, damages for humiliation and mental suffering are recoverable in addition to any damage caused to reputation. *Baldwin v. Boulware*, 79 Mo.App. 5, 11–12 (1899). Since any conceptual difference between the two kinds of slander disappears once each becomes actionable, it follows that such damages are also recoverable in an action for slander based on proof of special damage. Since the jury could reasonably have assessed plaintiff's emotional damage at $12,000, the award of actual damages is sustained.

The present case is distinguishable from *Snodgrass v. Headco Industries, Inc.*, 640 S.W.2d 147 (Mo.App.1982). There, the plaintiff based his slander claim on the loss of a particular contract to borrow $5,000 from a finance company. Plaintiff later obtained a loan in the same amount from another source. There was no evidence of the value of the lost agreement. The jury awarded actual damages of $5,000; the Court of Appeals reduced this award to the

nominal amount of $1. As in this case, the slander was actionable, based upon proof of the loss of a particular credit contract. However, in contrast to the present case, *Snodgrass* presented no claim of mental suffering or humiliation in support of the actual damage award. Having based her submission to the jury on adequate proof of such damage, plaintiff in the present case is entitled to the judgment obtained.

A contrary result was reached in *Rauch, supra*. In that case, plaintiff had pleaded and proved a slander which was not actionable *per se*. There was no evidence of actual damage other than humiliation. A judgment for actual damages in the sum of $750 was reversed as excessive, on the ground that humiliation is not allowable as general damage in an action for slander which is not actionable *per se*. As authority for this conclusion, the court relied on the following quote from Corpus Juris Secundum:

> A publisher of a libel not defamatory on its face is liable only for the pecuniary damage which legally resulted from the publication.

53 C.J.S. *Libel and Slander* § 240, p. 364 (1948). This statement, by its terms, has questionable application to slander, as distinct from libel.[2] In any event, however, Corpus Juris Secundum currently contains the observation that

> Once a cause of action has been established by proof of pecuniary damages resulting from words not actionable per se, general damages may be recovered for plaintiff's wounded feeling and humiliation and resulting physical illness.

53 C.J.S. *Libel and Slander* § 243, p. 119 (Supp.1985) (footnote omitted).

As we have said, the conceptual difference between *per se* and non-*per se* slander ceases to exist once special damages are proven in a non-*per se* case. Damages for

---

**2.** It is also possible that the statement is an inartful attempt to describe the causal threshold required for the recovery of pecuniary damages. The statement, in context, reads as follows:

> *Pecuniary damages.* Compensatory damages include pecuniary loss direct or indirect.

> A publisher of a libel not defamatory on its face is liable only for the pecuniary damage which legally resulted from the publication. *Id.* (footnotes omitted).

humiliation and mental suffering are recoverable in slander *per se* cases. *Baldwin, supra.* We hold that damages for humiliation and mental suffering are recoverable in non-*per se* slander cases once the requisite special damages are proven. To the extent *Rauch* is inconsistent with our holding, it is overruled.

Defendant raises additional points with respect to the sufficiency of the evidence as to vicarious liability and malice, plaintiff's verdict director, closing argument, and admissibility of evidence. As to those points, this Court adopts the opinion of the Court of Appeals, Eastern District, as authored by Reinhard, J., which is quoted below without further attribution.

### III.

■ We turn next to the question of whether Edna Raines was acting within the scope and course of her employment when the alleged statements were made. Defendant's liability, if any, is premised on the doctrine of respondeat superior, under which a master is liable for the torts of his servant which are committed within the scope of employment. *Wagstaff v. City of Maplewood*, 615 S.W.2d 608, 610 (Mo.App. 1981). There is no doubt that Ms. Raines was employed by defendant as plant secretary, that she worked in the Personnel Department,[3] and that her duties included answering the telephone and responding to employment verification requests. However, defendant contends that Ms. Raines's authority in regard to such requests was limited, and that she was not authorized to provide more than verification of employment.

As required by MAI 3rd 18.01, plaintiff's verdict director was modified to hypothesize the element of agency. "Scope and course of employment" was defined as set forth in MAI 3rd 13.02:

Acts were within the "scope and course of employment" as that phrase is used in this instruction even though not specifically authorized by Willert Home Products, Inc. if:

1. they were done by Edna Raines to further the business of Willert Home Products, Inc. under the general authority and direction of Willert Home Products, Inc., and

2. they naturally arose from the performance of Edna Raines' work.

Defendant does not contend that the element of agency was improperly hypothesized or that the definition submitted was inappropriate. Instead it argues that as a matter of law agency was not established by plaintiff.

The Committee's Comment following 13.-02 quotes extensively from *Haehl v. Wasbash R. Co.*, 119 Mo. 325, 24 S.W. 737, 740 (Mo.1893), to the effect that:

The principle of respondeat superior applies only when what is complained of was done in the course of the employment. The principal is responsible, not because the servant has acted in his name or under color of his employment, but because the servant was actually engaged in and about his business, and carrying out his purposes. He is then responsible, because the thing complained of, although done through the agency of another, was done by himself; and *it matters not in such case whether the injury with which it is sought to charge him is the result of negligence, unskillful or of wrongful conduct, for he must choose fit agents for the transaction of his business.* But if his business is done, or is taking care of itself, and his servant, not being engaged in it, not concerned about it, but impelled by motives that are wholly personal to himself, and simply to gratify his own feeling of resentment, whether provoked or unprovoked, commits an assault upon another, when that has and can have no tendency to promote any purpose in which the principal is interested, and to promote which the servant was employed, then the wrong is the purely personal wrong of the servant, for which he,

---

3. In oral argument, defendant admitted that Ms. Raines worked in Personnel.

and he alone, is responsible. (Emphasis ours.)

Further insight may be gleaned from the Restatement (Second) of Agency. Section 229 states that "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or *incidental* to the conduct authorized." (Emphasis ours.) Comment (b) explains that:

An act may be incidental to an authorized act, although considered separately it is an entirely different kind of an act. To be incidental, however, it must be one which is subordinate to or pertinent to an act which the servant is employed to perform. It must be within the ultimate objective of the principal and *an act which it is not unlikely that such a servant might do.* (Emphasis ours.)

Section 230 provides:

[a]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment.

Section 247 of the Restatement deals specifically with defamation:

If the master employs a servant to speak for him, he is subject to liability if the servant makes a mistake as to the truth of the words spoken or as to the justification for speaking them, or even if he speaks with an improper motive, provided that he acts at least in part to serve his employer's purposes. The master may be liable even though the servant knows the statement to be untrue, as where the manager of a store, for the purpose of obtaining an admission from a suspected thief, charges such person with other similar crimes, although having no belief in his own statements.

Finally, Comment (e) to § 247 states that:

It may be found to be within the scope of employment of a person managing a business to accuse another of wrongful conduct or to report to others the supposed wrongful conduct of an employee or other person. A servant having a duty to make such reports either to his employer or to others, to gather information, or to institute proceedings, may

subject his employer to liability for his untruthful statements constituting defamation because made in excess of a privilege to speak, *if he speaks in connection with his employment and with a purpose to serve it.* (Emphasis ours.)

Here, the evidence indicated that the defamatory statements were incidental to employment verification, a duty which Ms. Raines was authorized to perform as plant secretary. We believe that a jury could reasonably find that Ms. Raines' statements were intended to be in furtherance of the discharge of her assigned tasks, and not a means of requiting any personal feelings of antipathy toward plaintiff. Under these circumstances, a jury question existed as to whether Ms. Raines was acting within the scope of her employment.

### IV.

■ Defendant also contends that plaintiff adduced no evidence of malice. In order to recover punitive damages, or overcome a qualified privilege, plaintiff was required to prove that the statements were made with knowledge that they were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubts as to whether they were true. MAI 3rd 4.15; *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974). Edna Raines testified in plaintiff's case-in-chief that she had no knowledge of any judgments, credit complaints, or garnishments against plaintiff, and stated she had no access to such files. Thus if Ms. Raines made the defamatory statements, they could not have had a factual basis. This indicates at least a reckless disregard for the truth of the assertions. We find no error in the trial court's denial of defendant's motion for directed verdict.

### V.

■ Defendant also contends that the court erred in giving a verdict directing instruction based on MAI 3rd 23.10(1). It argues that the statements were qualified-

ly privileged, and, as indicated by the Notes on Use following MAI 3rd 23.10(1), where qualified privilege applies MAI 3rd 23.10(2) should be used. Unlike 23.10(1), 23.10(2) incorporates the malice standard set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The doctrine of qualified privilege has been stated as follows:

A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable. Upon such occasion and under such circumstances, although the matter communicated is defamatory and false, the law will not infer malice, but the existence thereof must be shown by some evidence beyond the falsity of the statements communicated. (Citations omitted.)

*Estes v. Lawton-Byrne-Bruner Insurance Agency Co.*, 437 S.W.2d 685, 690 (Mo.App. 1969). The applicability of the defense of qualified privilege is a matter of law to be decided by the trial court. *Id.* at 691.

*Cash v. Empire Gas Corp.*, 547 S.W.2d 830, 833 (Mo.App.1977), states that:

In the application of this principle it has been stated that "It is an established general rule that a communication respecting the character of an employee or former employee is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a definite interest therein, * * *. So long as good faith is present, the person making the statement is not limited to·facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not. (Citations omitted.)

In regard to the meaning of "good faith" in this context, it was noted in *Estes, supra,* that:

On analysis, all the references made in these opinions to statements being "made in good faith, without malice, under probable cause to believe (them) to be true," go to the actual and express malice which is required to overcome and destroy the privilege.

437 S.W.2d at 691.

In *Cash,* the Court found that as a matter of law, a conditional privilege applied to the alleged defamatory communication regarding plaintiff which was made on behalf of his former employer to the agent of a prospective employer. Although Civic Finance Company was not a prospective employer of plaintiff, it was about to enter into a business relationship with plaintiff, and its interest in the information was no less substantial that than of the prospective employer in *Cash.* We believe that the statements made in this case are likewise, as a matter of law, qualifiedly privileged. The court therefore erred in submitting MAI 3rd 23.10(1) instead of 23.10(2).

■ However, we find that no prejudice to defendant resulted from this error. The instruction submitted regarding damages, based on MAI 3rd 4.15, read as follows:

If you find the issues in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe she sustained as a direct result of making of the statements mentioned in the evidence.

If you find the issues in favor of plaintiff, and if you believe that defendant made the statements *with knowledge that they were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true,* then·in addition to any damages to which you find plaintiff entitled under the foregoing paragraph, you may award plaintiff an additional amount as punitive damages in such sum as you believe serve to punish defendant and to deter it

and others from like conduct (emphasis ours).

Thus, the jury was instructed on all the elements that defendant contends they should have been. By returning a verdict which included $35,000 in punitive damages, the jury clearly found the malice, as defined in *Sullivan,* necessary to overcome the qualified privilege. We believe that a verdict director based on 23.10(2) would not have changed the jury's determination.[4]

## VI.

▉ Defendant also contends that the trial court, over objection, permitted plaintiff's counsel to make impermissible remarks during closing argument. In its brief defendant asserts:

> During closing argument, counsel for Plaintiff argued that the alleged slanderous statements were made in response to Plaintiff filing a race discrimination complaint and standing up for her civil rights. Defendant timely objected to the above statements by Plaintiff's counsel. The trial court overruled the objection, and Defendant moved for a mistrial which was also overruled.

This entire issue was in effect raised by defendant during cross-examination of plaintiff. Defense counsel asked plaintiff if she knew of any reason why Edna Raines would say anything untruthful about her. Plaintiff testified that "[she] had filed a EEOC complaint against the company, and then everybody changed on [her]; everybody." Defense counsel elicited testimony regarding the EEOC charge, then inquired: "... Now, it's your testimony that that charge—you made a charge against the company and the company's feelings toward you changed?" Plaintiff replied "yes."

We now examine the complained of portion of plaintiff's argument.

\* \* \* \* \* \*

Now you ask yourself if that is likely to happen. Or is it more likely what happened is that Roberta Carter in standing up for her civil rights filed a race discrimination complaint over at Willert Products? She told you once she did that things changed.

[defense counsel]: Your Honor this is outside the evidence. I move that it be stricken and the jury instructed to disregard it.

THE COURT: Overruled.

[plaintiff's counsel]: She told you things changed. She then got a disciplinary layoff. She told you that. She then decided to paint the house—

[defense counsel]: Your Honor, that's highly improper. That was not the reason for the disciplinary layoff. It's highly prejudicial. I move that it be stricken and the jury instructed to disregard it.

THE COURT: I'll overrule your objection.

[defense counsel]: In fact, Your Honor, that is so inflammatory, I'm going to ask the Court to grant a mistrial. That is improper and it's wrong and it's contrary to the evidence.

THE COURT: I'll overrule your motion for a mistrial.

\* \* \* \* \*

Defendant's objections are without merit. The statements regarding the EEOC complaint are clearly supported by the evidence.[5] In addition, contrary to defense counsel's contention, the argument quoted above does not contain an assertion that the disciplinary layoff was a result of the race discrimination complaint. Plaintiff's counsel did not misstate the facts, and the inferences he drew were within the bounds of reasonable argument.

---

**4.** We are cognizant of *Brown v. P.N. Hirsch & Company Stores, Inc.,* 661 S.W.2d 587 (Mo.App. 1983). There the court found error, as do we, in the submission of MAI 3rd 23.10(1) in a case where qualified privilege applied. The Western District reversed the judgment in that case; however, because other infirmities in the in-struction given there were found, we do not believe that decision is applicable here.

**5.** Plaintiff's EEOC complaint, according to the Title VII determination introduced as an exhibit by defendant, was found by the Commission to be without reasonable cause. Notice of Right to Sue was then issued to plaintiff. As part of the

### VII.

Finally, defendant asserts that the trial court erred in admitting a Trans Union Credit Report which contained the names and social security numbers of both plaintiff and her husband. Assuming *arguendo* that defendant is correct in claiming that the report pertained solely to plaintiff's husband and was therefore irrelevant, we find no prejudice to defendant from its admission. Defendant admitted that plaintiff's credit rating was good in final argument, and there was testimony supporting that conclusion. Defendant's point is without merit.

The judgment of the trial court is affirmed.

HIGGINS, C.J., and BILLINGS, BLACKMAR, DONNELLY and RENDLEN, JJ., concur.

WELLIVER, J., dissents.

settlement of a class action suit brought by other employees against defendant, defendant paid plaintiff $2,000 in exchange for a covenant not to sue. That check was also admitted into evidence.