[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case concerns a bank suing a debtor on a note. The plaintiff is Fleet National Bank (successor to Connecticut National Bank, the original noteholder). The defendant is Attorney Robert B. Cohen. The note at issue herein arose from three prior notes on which Mr. Cohen and his partners were jointly and severally liable. When the partnership failed, the present note and agreement were drawn purporting to state the amount due from the named obligors individually, not jointly and severally. The new note did not include all the former partners, as one partner, Attorney Brian Woolf, had declared bankruptcy.
The basis for the note was a "Consent Agreement."
The "Consent Agreement" (hereinafter "agreement") which is the basis for the note in the amount of $298,000 puts one in mind of Churchill when he spoke of ". . . a riddle wrapped in a mystery inside an enigma."
The paragraphs set forth in the agreement after the recital of the $298,000 due cannot be explained absent extrinsic evidence. The agreement states that the amounts due are as follows:
 Cohen 169,700 Beharry 22,500 Cavanaugh 22,500 ------- This totals: 214,700
CT Page 12825
The only other mention of a specific amount is in paragraph three which states, in part, that "Cohen has paid or will turn over $41,500 upon execution hereof to be applied to the Notes."[1]
 Adding $ 41,500 (to the prior total for Cohen Beharry and Cavanaugh) 214,700 ------- The total is now 256,200
Thus, after adding all the mentioned amounts, the total is still short of the $298,000 in the amount of $41,800.
The second portion of paragraph three states that "Cavanaugh has paid or will turn over all funds presently held in an escrow account in the name of Thomas Skelley."[2] The evidence shows that this account was held by Connecticut National Bank. In fact, $41,300 was turned over from this account, so the current total is now
 256,200 plus 41,300 ------- for a new total 297,500
The explanation of the $500 shortfall is that Mr. Cohen had made a $500 payment prior to the execution of the agreement. This was reflected in the deletion of $170,200 as Mr. Cohen's payment and changed to $169,700. When this was done, the $298,000 should have been changed to $297,500 to reconcile the amounts. This was not done.
There is another paragraph which does not state an amount. Paragraph four provides that:
 (4) Cavanaugh agrees that funds received by him or Halloran and Sage and which represent payment due to the Borrower on files moved from the Borrower to Cavanaugh and/or Halloran and Sage will be remitted to the Bank without discount, set-off, or counterclaim for application to the Cohen Note.
The amount of $3,023.12 was forwarded by letter dated August 21, 1992 to be applied to the Cohen Note[3] pursuant to this CT Page 12826 provision.
Paragraph six states that
 (6) This Consent and Release Agreement shall be effective when the Bank has received (i) the Cohen Note and the Cavanaugh Note together with any documents or agreements related thereto fully executed and satisfactory to the Bank and its counsel, (ii) executed counterparts of this Agreement, and (iii) receipt of the payments outlined in Paragraph 3 hereof. On such date as this agreement becomes effective, the Notes shall be marked "Paid".
The evidence shows that all these conditions were met. In accordance with the terms of the agreement, compliance with these terms would result in the payment of the original notes executed by the partnership in the amount of $298,000 (the amount an earlier portion of the agreement recites as the amount "currently" owed).
The issue as to the amount owed revolves around the actual figure owed by Mr. Cohen. It is the bank's position that Mr. Cohen owed the stated amount of $169,700 after the $41,300 was applied to the old indebtedness. It is Mr. Cohen's position that he was to get credit for the $41,300 against the amount of $169,700.
Paragraphs two, three and six are clear insofar as they show Mr. Cohen's indebtedness to be $169,700 after his payment of $41,500. Mr. Cohen does not dispute this. The second portion of paragraph three does not recite how the "funds presently held in an escrow account" are to be applied — whether it is to the total of the indebtedness or to Mr. Cohen's indebtedness.
The only evidence that the $41,300 is to be applied to the total amount is the recitation that the three borrowers "wish to pay the Notes in full . . .". However, even this is contradicted by paragraph six which contemplates extinguishing the prior indebtedness of $298,000 upon the fulfillment of its terms — allof which were met — and which would result in a $41,300 shortfall against the $298,000. Paragraph 6 states that the prior notes will "be marked `Paid' [upon] receipt of the payments outlined in Paragraph 3 hereof." These amounts were received. CT Page 12827
The evidence and law that support Mr. Cohen's claim that the $41,300 was to be applied to his personal indebtedness under the new note carry the greater weight:
 1. Mr. Cohen had already agreed, by assenting to the $169,700 and the $41,500, to assume liability far in excess of his share in the partnership that incurred the original indebtedness.[4]
 2. Mr. Cohen was not involved in negotiating the note. The court concludes that this was because the partners were not getting along at that time and because Mr. Cohen was resigned to doing whatever was required to save his credit and reputation.
 3. The only testimony on the record from anyone involved in the negotiations surrounding the agreement was from Mr. Cavanaugh. Mr. Cavanaugh's testimony was that there was "no question" that the $41,300 was to be credited against the Cohen note.
 4. The evidence showed that Attorney Ellen Levine, currently in private practice in Hartford, drew the agreement. The defendant asks the court to draw an adverse inference from the fact that she did not testify. The criteria which would permit the court to do so has been met. Under Secondino v. New Haven Gas Co., 147 Conn. 672, 165 A.2d 598 (1960), an adverse inference may be drawn if the witness is available and is one the party would naturally produce. Having met this test in the present case, the defendant is entitled to have the court infer that Attorney Levine's testimony would be unfavorable to the plaintiff.
 5. Paragraph three is silent as to how the funds in the escrow account ($41,300) are to be applied, in contrast to the fact that paragraph three is specific that the $41,500 is to be paid by Mr. Cohen in addition to the $169,700. This is clear because the agreement recites that the $41,500 is to be applied to the "Notes" which are CT Page 12828 defined in the agreement as the original "(3) promissory notes."
 6. Both paragraphs three and four refer to amounts to be turned over by Cavanaugh. The amounts in paragraph four to be turned over by Cavanaugh are to be applied to the $169,700 (the "Cohen Note"). That portion of paragraph three which refers to amounts to be turned over by Cavanaugh (the $41,300) is silent as to where the funds are to be applied. It is not illogical, in the absence of clarification within the agreement, to interpret this to mean that all the amounts in Mr. Cavanaugh's control are to be credited to the "Cohen Note." If paragraphs three and four are run together without interposing the number (4), they would read as follows:
 Cohen has paid or will turn over $41,500 upon execution hereof to be applied to the Notes. Cavanaugh has paid or will turn over all funds presently held in an escrow account in the name of Thomas Skelley. Cavanaugh agrees that funds received by him or Halloran and Sage and which represent payment due to the Borrower on files moved from the Borrower to Cavanaugh and/or Halloran and Sage will be remitted to the Bank without discount, set-off, or counterclaim for application to the Cohen Note.
The reference to the "Notes" in the first line ends any reference to the full amount of the original three promissory notes — the "Notes" upon which Mr. Cohen paid $41,500. The only reference after that is to the "Cohen Note," which is the $169,700.
The court has conceded that the agreement is difficult to interpret. Contract principles have long held that ". . . when two or more meanings may fairly be given to language in a contract, the language is to be construed against the one who drew it. . . ." Sturman v. Socha, 191 Conn. 1, 9, 463 A.2d 527
(1983) (citation omitted). "The language of a contract is typically construed most strongly against the party whose language it is and for whose benefit it was inserted." Id. (Citations omitted.) CT Page 12829
 `The premise operating behind the rule would seem to be a psychological one. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests.'
Griswold v. Union Labor Life Ins. Co., 186 Conn. 507, 513,442 A.2d 920 (1982) (Citations omitted.)
In accordance with the findings and conclusions herein, the court determines Mr. Cohen's indebtedness to be as follows:
As of the date of the signing of the agreement:
 211,200 less 41,500 less 41,300 . . . and any other amount that ------- was in this account 128,400 subsequent to 4-2-92. The bank may factor these amounts in as of the dates the funds were available.
All payments made to date are to be recalculated and credited on the original amount of $128,400[5] under the terms of the note.
Any balance that remains as of the date of this decision will be paid under the terms of the note as though there had been no default. Payments will resume on the thirtieth day following the date of this decision. If it is determined that the debt has been overpaid, the balance will be refunded with interest at the same rate as that of the note calculated from the day the debt would have been paid.
The court is not obligated to consider the counterclaims for damages pursuant to CUTPA or for "slander of credit" as the parties specifically declined the opportunity to file a memorandum of law. Nevertheless, the court has considered these claims.
The court finds no evidence to support these claims despite the fact that Mr. Cohen's treatment at the hands of the bank was less than honorable. Mr. Cohen had been in good standing with the CT Page 12830 bank for almost thirty years, and had engaged in transactions which were profitable to the bank. Nevertheless, the following facts preclude his claims:
 1. Mr. Cohen is an attorney who should have been expected to monitor his affairs in a manner which would have revealed the discrepancy between his and the bank's interpretation of the agreement. The evidence shows that he made payments in accordance with the bank's figures for two years before he realized that he should have been credited with the $41,300. The bank would urge the court to take this as an admission that Mr. Cohen accepted the bank's interpretation of the agreement. The court declines to draw this inference based on the fact that Mr. Cohen did not monitor the situation, did not review his own statements, and assigned the duty of making payments to his bookkeeper. His realization that he was not credited for the $41,300 came sometime in 1994 and was communicated to the bank by letter dated November 30, 1994.
 2. Mr. Cohen declined to take part in the negotiations for the note. Had he done this, the present controversy might never have occurred.
Thus, despite the fact that Mr. Cohen acted in the utmost good faith[6] at all times, he does bear some responsibility for the events that transpired. Insofar as he failed to assert his rights under the agreement in a timely manner, the conduct of the bank does not rise to the level of the asserted counterclaims for damages under CUTPA. With regard to plaintiff's claims for "slander of credit," the court finds no Connecticut case on this asserted cause of action. Cases from other jurisdictions, although not specifically naming such a cause of action, speak to libel and slander in the context of credit transactions. As to slander specifically, there is no evidence that the bank communicated any information about Mr. Cohen's credit orally. From the evidence presented, it appears that the defendant would have the court infer that the fact that the bank "set off" the amount in Mr. Cohen's checking account against the loan (at a time when the bank considered the loan in default because Mr. Cohen had paid only interest due to illness) created in the minds of those whose checks were dishonored the thought that Mr. Cohen CT Page 12831 could not meet his obligations. However, the bank had never agreed to accept interest only. In addition, Mr. Cohen asserts the fact that the loan was considered by the bank to be "non-performing" affected his ability to secure further credit. The evidence is not specific on these points. As previously noted, Mr. Cohen did not dispute the amount of the loan originally, and, as a technical matter, remained bound by its terms until such time as the dispute was resolved. The fact that the court observes that the bank might have been expected to show more consideration for a customer of long and good standing does not rise to the level of libel or "slander of credit," if such a cause of action is to be recognized. Cases from other jurisdictions recognizing recovery for libel or slander in credit transactions are based on extremely strict standards. See Carterv. Willert Home Products. Inc., 714 S.W.2d 506 (1986) (plaintiff recovered where, after applying for credit, employer's agent falsely stated that plaintiff had credit complaints, judgments and garnishments against her, was in disciplinary layoff and would probably be fired); Dun Bradstreet. Inc. v. O'Neil,456 S.W.2d 896 (1970) (no recovery even though credit agency sent false report that businessman had filed for bankruptcy); Watwoodv. Credit Bureau. Inc., 97 A.2d 460 (1953) (false credit report to interested subscriber privileged unless made in bad faith or for an improper cause); Carter v. Sterlin Finance,132 So.2d 430 (1961) (oral statement that plaintiff was a `deadbeat and not an honest person' slander per se and sets forth claim upon which relief may be granted); Baird v. Dun Bradstreet, 285 A.2d 166
(1971) (verdict for plaintiff upheld where credit reporting agency issued false report that plaintiff had been indicted for adultery). The facts of the present case do not rise to the level of those in the above cited cases.
Judgment may enter for the defendant as set forth herein. Judgment may enter for the plaintiff as to all defendant's counterclaims.
Dunnell, J